IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-02372-NRN

L.A.,

Plaintiff,

v.

MARTIN O'MALLEY, Commissioner of Social Security,

Defendant.

---

## OPINION AND ORDER

---

**N. Reid Neureiter**
**United States Magistrate Judge**

The government determined that Plaintiff L.A.[1] was not disabled for purposes of the Social Security Act. AR[2] 27. Plaintiff has asked this Court to review that decision. The Court has jurisdiction under 42 U.S.C. § 405(g), and both parties have agreed to have this case decided by a United States Magistrate Judge under 28 U.S.C. § 636(c). ECF No. 11.

## Standard of Review

In Social Security appeals, the Court reviews the decision of the administrative law judge ("ALJ") to determine whether the correct legal standards were applied and whether the factual findings are supported by substantial evidence. *See Krauser v.*

---

[1] Pursuant to D.C.COLO.LAPR 5.2, "[a]n order resolving a social security appeal on the merits shall identify the plaintiff by initials only."

[2] All references to "AR" refer to the sequentially numbered Administrative Record filed in this case. ECF No. 10, and 10-1 through 10-16.

*Astrue*, 638 F.3d 1324, 1326 (10th Cir. 2011); *Pisciotta v. Astrue,* 500 F.3d 1074, 1075 (10th Cir. 2007). "[I]f the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993); *Parker v. Comm'r, SSA*, 772 F. App'x 613, 617 (10th Cir. 2019) ("If [plaintiff] is right about the legal error, we must reverse even if the agency's findings are otherwise supported by substantial evidence.").

"Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." *Raymond v. Astrue*, 621 F.3d 1269, 1271–72 (10th Cir. 2009) (internal quotation marks omitted). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes a mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The Court "should, indeed must, exercise common sense" and "cannot insist on technical perfection." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012). The Court cannot reweigh the evidence or its credibility. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). However, it must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty v. Astrue*, 515 F.3d, 1067, 1070 (10th Cir. 2007).

If the correct legal standards were applied and substantial evidence supports the findings of the Commissioner, the Commissioner's decision stands and the plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for

reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted).

**Background**

## I.   Procedural History

Plaintiff filed a disability insurance benefits claim on April 23, 2014 and a disabled widow's benefits claim on May 14, 2014, alleging a disability onset date of June 22, 2013 (the date of Plaintiff's husband's death), and alleging disabling conditions of asthma, chronic obstructive pulmonary disease ("COPD"), major depression, bronchitis, body pain, leg edema, and lung pain. AR 234, 250. Plaintiff's claims were initially denied on September 2, 2014. AR 248, 263. Plaintiff then requested a hearing by an ALJ, which was ultimately held on January 11, 2017. AR 281, 1535. Following the hearing, the ALJ denied Plaintiff's claims on February 24, 2017. AR 8–36. Plaintiff requested that the Appeals Council ("AC") review the ALJ's decision on April 3, 2017, and the AC denied review on April 28, 2018. AR 1–5, 375.

On June 18, 2018, Plaintiff sought review of the ALJ's decision in the United States District Court for the District of Colorado. AR 1473–77. While this appeal was pending in the district court before Judge R. Brooke Jackson, Plaintiff filed a second claim for widow's benefits on July 24, 2018, this time alleging a disability onset date of February 25, 2017 (one day after the first ALJ decision), and alleging disabling conditions of asthma, COPD, digestive disorders, low back pain, joint pain, thyroid impairments, vision impairment, chronic throat condition, major depression, and anxiety. AR 1512. The new claim was partially granted in a February 27, 2019 decision which found that Plaintiff was disabled as of April 24, 2018. AR 1527–28. On April 25, 2019,

Judge Jackson reversed and remanded the original February 24, 2017 unfavorable ALJ decision for reconsideration. AR 1478–1503.

On May 21, 2019, Plaintiff sent a letter to the AC requesting that the ALJ confine her review of Plaintiff's original claim to the period between June 22, 2013 (Plaintiff's original alleged onset date) and April 23, 2018 (the day before the established disability onset date in Plaintiff's second widow's benefits claim). AR 1756. On June 12, 2019, the AC granted this request, and ordered that the ALJ reconsider her initial decision only for this time period. AR 1506.

The ALJ conducted another hearing on December 8, 2022, and issued another unfavorable decision on January 11, 2023. AR 1417, 1385–1416. On January 27, 2023, Plaintiff appealed by filing a Notice of Exceptions with the AC. AR 1372–81. On July 19, 2023, the AC declined to assume jurisdiction. AR 1366–70. Plaintiff then filed this case seeking review of the ALJ's January 11, 2023 decision.

## II.   The ALJ's January 11, 2023 Decision

At the second step of the Commissioner's five-step sequence for making determinations, the ALJ found that Plaintiff had the severe impairments of major depressive disorder; anxiety disorder, unspecified; post-traumatic stress disorder ("PTSD"); asthma; and COPD. AR 1391. The ALJ also determined that Plaintiff had non-severe impairments including right ankle edema, fibroids, left renal cyst, right ovarian cyst, gastroesophageal reflux disease, thyroid nodules, arthritis, sleep apnea, facial rash, temporomandibular joint dysfunction, blurred vision, a kidney stone, and a non-medically determinable impairment of joint and back pain. AR 1391–92. The ALJ

also noted that Plaintiff's 2019 separate cognitive disorder diagnosis was not a supported diagnosis during the period under review. AR 1392.

The ALJ determined at step three that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR, Part 404, Subpart P, Appendix 1. AR 1392–94. Because she concluded that Plaintiff did not have an impairment or combination of impairments that met the severity of the listed impairments, the ALJ then determined the Plaintiff's RFC. In terms of her physical capacity, the ALJ found that

> from June 22, 2013 through April 23, 2018, the claimant had the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except occasionally lift and/or carry about 20 pounds and frequently lift and/or carry about 10 pounds, stand and/or walk for about 6 hours out of an 8-hour workday, and sit for about 6 hours out of an 8-hour workday; avoid work on ladders, ropes, and scaffolds; occasionally climb stairs and ramps; frequently balance, stoop, kneel, crouch, and crawl; could tolerate occasional exposure to extreme heat or cold, to concentrated wetness, or to high humidity; could tolerate occasional exposure to concentrated pulmonary irritants such as fumes, odors, dust, and gases; should avoid work at unprotected heights or in close proximity to dangerous moving machinery.

AR 1394–95. Regarding Plaintiff's mental capacity, the ALJ found that Plaintiff

> could understand and remember simple routine tasks that can be learned in a short time, typically in 30 days; could sustain concentration, persistence, and pace for these takes over a typical workday and workweek; could interact appropriately with supervisors and coworkers but should not be required to work directly with the public, such as customer service duties, but could tolerate occasional, incidental public contact; could make simple work decisions and tolerate occasional routine-type task changes; and was able to travel plus can recognize and avoid work hazards.

AR 1394–95.

At step four, the ALJ found that Plaintiff had no past relevant work. AR 1403. The VE testified that someone with the same RFC, age, education, and work experience as

Plaintiff could perform the jobs of small parts assembler, sorter, and marker. AR 1404. The ALJ then concluded that Plaintiff was able to make a successful adjustment to other work that exists in significant numbers in the national economy, and, accordingly, determined that Plaintiff was not disabled from June 22, 2013 through April 23, 2018. AR 1405.

## Analysis

Plaintiff first argues that the ALJ's 2023 decision contains four of the same harmful errors contained in her 2017 decision, as explained in Judge Jackson's 2018 remand order. Second, Plaintiff argues that the ALJ's omission of an RFC limitation regarding Plaintiff's nebulizer use was not supported by substantial evidence. Third, Plaintiff argues that the ALJ incorrectly omitted an RFC limitation regarding Plaintiff's need for extra supervision. Fourth, Plaintiff argues that the opinion of her treating physician, Dr. Craig Shapiro, should have been entitled to controlling weight under the treating physician rule. The Court addresses each argument in turn.

### I.   Repetition of Prior Errors

Plaintiff argues that the ALJ repeated four errors in the 2023 decision that Judge Jackson held required a remand of the ALJ's 2017 decision. The Court addresses each of the four alleged errors and finds that the ALJ has not repeated these errors in the decision at issue here.

Plaintiff first points to the ALJ's 2017 conclusion that certain of Plaintiff's activities of daily living were inconsistent with her alleged disability:

> [T]he claimant's alleged daily activities are not entirely consistent with the claimant's allegation of disabling physical and mental symptoms and limitations. For example, the claimant reported and testified that she is able to tend to her personal hygiene, prepare simple meals, engage in

household chores . . . . The above activities of daily living require significant physical and mental demands, which are not consistent with the level of limitation the claimant alleges. Accordingly, the undersigned finds that the claimant's activities of daily living suggest a greater degree of functional capability than claimed.

AR 20. Judge Jackson found that these activities were not inconsistent with Plaintiff's alleged disability because the record indicated, and the ALJ did not mention in her decision, that showering made Plaintiff "very short of breath and tired"; her food preparation was limited a five-minute preparation of toast, sandwiches, or frozen dinners; and she vacuumed only twice a month and needed to pause frequently to use an inhaler. AR 1494. Plaintiff argues that the 2023 decision again incorrectly concluded that these activities of daily living were inconsistent with her alleged disability. But in contrast to the 2017 decision, the 2023 decision describes Plaintiff's daily activities by stating that Plaintiff "has difficulty showering due to shortness of breath and performs only limited meal preparations at a time," and "[h]er daughter was doing most of the housework," before concluding that Plaintiff's reported symptoms are not entirely consistent with evidence in the record. AR 1395–96. This indicates that, unlike in the 2017 decision, the ALJ more fully considered not only Plaintiff's ability to "tend to her personal hygiene, prepare simple meals, [and] engage in household chores," but also the difficulties that she experienced when performing these tasks. Accordingly, the Court declines to reweigh the evidence that the ALJ has already considered in evaluating the significance of Plaintiff's personal hygiene and meal preparation activities.

Second, the 2017 decision cited Dr. Ergi Gumusaneli's (Plaintiff's treating physician) report that Plaintiff was capable of participating in vocational rehabilitation as

"rais[ing] some questions as to whether the current unemployment is truly the result of medical problems." AR 20. Judge Jackson held that "Dr. Gumusaneli's note indicates nothing more than the doctor's belief that she could begin a vocational rehabilitation program," and did not indicate that Dr. Gumusaneli believed that Plaintiff was not disabled and could work. AR 1496–97. Plaintiff argues that the ALJ's 2023 decision "has again cited the fact that [Dr. Gumusaneli] recommended vocational rehabilitation as a reason to deny" her claim. ECF No. 12 at 41. The Court disagrees. The 2023 decision accords great weight to Dr. Gumusaneli's opinion, and states that he found that Plaintiff was capable of attending vocational rehabilitation, but does not draw any connection between Plaintiff's ability to work and Dr. Gumusaneli's opinion regarding vocational rehabilitation.

Third, in the 2017 decision, the ALJ stated that the fact that Plaintiff "is able to help care for her mentally disabled brother" in part "suggest[ed] a greater degree of functional capability than claimed" regarding Plaintiff's RFC. AR 20. Judge Jackson found that the ALJ failed to explain why Plaintiff's ability to act as her disabled brother's designated payee for disability benefits was inconsistent with Plaintiff's alleged limitations. AR 1494. In the 2023 decision, the ALJ discussed Plaintiff's care for her brother in the context of the step three "Paragraph B" criteria for evaluating mental impairments. One of the Paragraph B criteria is a plaintiff's ability to interact with others. The ALJ found that Plaintiff had a moderate limitation in this area. On one hand, she reported that she did not spend time with others, and was depressed, anxious, and tearful upon examination. On the other hand, she got along with family, friends, and neighbors; demonstrated an appropriate mood and affect; was cooperative and

pleasant with good eye contact; had no problems relating to providers; and "confirmed at the hearing she was helping ensure her sick brother who [lived] across the street was receiving adequate care at his home from providers." AR 1393. Unlike the ALJ's 2017 decision, it is clear in this context that the ALJ found that Plaintiff's ability to interact with her brother and her brother's care providers was relevant to her ability to interact with others. Accordingly, the Court finds that the 2023 decision provides adequate explanation of the ALJ's consideration of Plaintiff's care for her sick brother.

Fourth, the 2017 decision stated that although Plaintiff has been advised to quit smoking tobacco due to her asthma and COPD, she continued to smoke about a half pack of cigarettes each day, and "[t]his evidence of non-compliance demonstrates a possible unwillingness to do what is necessary to improve her conditions. It may also be an indication that her symptoms are not as severe as she purports." AR 20. However, Judge Jackson pointed out that the record additionally indicated that Plaintiff reported that she smokes to relieve her anxiety, that she does not inhale much when she smokes, that she does not smoke when her asthma or COPD flare, and that she has tried and failed to quit in the past. AR 1497. Judge Jackson further noted that 75-80% of smokers who try to quit relapse within the first six months, and that people with mental illness are particularly vulnerable. AR 1497. Judge Jackson ultimately found that Plaintiff likely continued to use tobacco due to its addictive nature, and substantial evidence did not indicate that Plaintiff's smoking was inconsistent with her alleged symptoms. AR 1498. In the 2023 decision, the ALJ did not find that Plaintiff's smoking a half pack of cigarettes per day demonstrated any unwillingness or non-compliance on Plaintiff's part, but instead, that Plaintiff "being physically capable of smoking is inconsistent with the

alleged severity [Plaintiff's] respiratory condition," which includes coughing, sputum, chest pressure, dyspnea, wheezing, and daily shortness of breath. AR 1397–98. An ALJ may properly find that a claimant's continued smoking is inconsistent with her allegations regarding the severity of her lung disease. *See Kruse v. Astrue*, 436 F. App'x 879, 887 (10th Cir. 2011). Accordingly, the Court finds that the ALJ did not err in her consideration of Plaintiff's smoking within the context of the severity of Plaintiff's respiratory condition.

## II.     Limitations Regarding Daily Nebulizer Use

Plaintiff additionally argues that the ALJ erred by failing to include RFC limitations regarding Plaintiff's documented need for repeated nebulizer treatments throughout the day, and failed to explain why this limitation was not included in the RFC. Plaintiff argues that two vocational experts have opined that three additional breaks per day would preclude someone with Plaintiff's limitations from employment. Plaintiff cites Social Security Ruling ("SSR") 96-8p, which states that an RFC assessment should be "based on *all* of the relevant evidence in the case record, such as . . . [t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment," for example, "frequency of treatment, duration, [and] disruption to routine." SSR 96–8p, 1996 WL 374184 at *2. Plaintiff argues that the ALJ in this case did not consider such limitations or restrictions. ECF No. 12 at 45. In response, the Commissioner argues that Plaintiff has not established that she could not do her nebulizer treatments before and after work or during normal work breaks, and no doctor has opined that Plaintiff would require breaks during the workday to complete nebulizer treatments.

Plaintiff's nebulizer use during the relevant time period (June 22, 2013 through April 23, 2018) is well-documented in the record. In March 2014, Dr. William Jurgens instructed Plaintiff to use the nebulizer every three to four hours as needed for wheezing and shortness of breath. AR 666. In June 2014, a progress note from Dr. Craig Shapiro states that Plaintiff should continue her nebulizer use three times per day, AR 631, and PA Robert Holstead documented that Plaintiff should use the nebulizer four times per day, AR 702. In a function report completed in June 2014, Plaintiff stated that she typically begins her day with a nebulizer treatment. AR 437. In February 2015, PA Holstead again documented that Plaintiff should use the nebulizer four times per day. AR 917–18. In June 2017, Dr. Charity Reynolds documented that Plaintiff was using the nebulizer once per day when sick, and should use it four times per day. AR 2062–63. In November 2017, Dr. Reynolds noted that Plaintiff was using the nebulizer one to two times per day, and recommended that Plaintiff use the nebulizer four times per day, AR 2067–68, 2146–47.

Plaintiff provided further detail regarding her nebulizer use at the December 2022 hearing. Plaintiff testified that, at the time of the 2017 hearing, she was using a nebulizer three timers per day for 15 to 20 minutes each time, and she continued to use a nebulizer at this frequency through April 2018. AR 1427. She testified that her nebulizer use was sometimes during the day and sometimes at night. AR 1427. Plaintiff further testified that her nebulizer use was "kind of, on a schedule because when I don't do it, I can tell by my breathing" and that she uses the nebulizer at night "when I wake up and I can't breathe." AR 1427–28.

Testimony from vocational experts in the 2017 and 2022 hearings indicates that two to three additional breaks during the workday, in addition to normal breaks, would likely preclude employment for someone with Plaintiff's limitations. In the January 2017 hearing, VE Mr. Pruding testified that if someone with Plaintiff's limitations had to take two to three additional breaks per day to refocus and recover from a bout of anxiety, that each break was 10 to 15 minutes in length, and these breaks were taken in addition to the normal breaks (meaning the person took a total of five breaks per day), this would reduce the person's productivity by more than 10 percent, meaning that they would lose their job. AR 220–21. In the December 2022 hearing, VE Sydney Thompson testified that if a person with Plaintiff's limitations "had to take at least three . . . additional breaks during the day of 15 to 20 minutes each to take care of a medical condition," no work would be available for that person. AR 1434–35.

The ALJ's decision notes that Plaintiff testified that she uses a nebulizer three times per day for 15-20 minutes each time, and states that "[s]he uses it on somewhat of a schedule because without it she can sense a change in her breathing." AR 1395. However, the decision does not say anything further regarding the nebulizer treatments or whether Plaintiff needs any additional or scheduled breaks to complete them.

Although "[t]he ALJ did not expressly determine whether [her nebulizer use] affected her RFC assessment," "[t]he Court nonetheless concludes that [Plaintiff] has not established that [her nebulizer use was] a limitation that should have been accounted for in the RFC finding." *Valois v. Saul*, No. 20-CV-0463-WJM, 2021 WL 527376, at *6 (D. Colo. Feb. 12, 2021). The record supports the ALJ's finding that Plaintiff uses a nebulizer three times per day on "somewhat of a schedule," However,

the Court does not find support in the record for Plaintiff's argument that each of these breaks would need to occur during the workday or would need to occur separately from normal work breaks. Plaintiff has reported that one of the treatments usually occurs first thing in the morning, sometimes she uses the nebulizer at night, and her nebulizer use is somewhat predictable so that she can keep her breathing regular. Therefore, the VE testimony about additional breaks does not obligate the ALJ to conclude that Plaintiff is precluded from employment based on her nebulizer use, or even to include additional discussion about the nebulizer in the RFC finding.

### III. Limitations Regarding Extra Supervision

#### a. Parties' arguments

Plaintiff additionally argues that the ALJ erred in failing to include a limitation of extra supervision in Plaintiff's RFC. Plaintiff argues that three medical experts (consultative examiner Timothy Doenges, Ph.D., psychological medical expert Robert Pelc, Ph.D., and consultative examiner Richard B. Madsen, Ph.D.) found that Plaintiff would require extra supervision at work, and no medical evidence contradicts these opinions. Plaintiff further argues that although the ALJ gave moderate weight to Dr. Doenges' opinion, she gave great weight to Dr. Pelc's opinion, and in the 2017 hearing, Dr. Pelc testified that he agreed with Dr. Doenges' finding that Plaintiff would need extra supervision. Plaintiff additionally argues that the ALJ did not provide a reason supported by substantial evidence for affording Dr. Madsen's opinion little weight. Plaintiff argues that the omission of an extra supervision requirement was not harmless error because VEs in the 2017 and 2022 hearings testified that a requirement of extra supervision would preclude Plaintiff from competitive employment.

13

In response, the Commissioner argues that the opinion of psychological consultant Gayle Frommelt, Ph.D., supports the ALJ's conclusion that Plaintiff does not require extra supervision, and that the ALJ adequately explained why she did not adopt the opinions of Drs. Doenges, Pelc, and Madsen regarding a need for extra supervision. The Commissioner argues that Judge Jackson's prior remand order held that Dr. Pelc's medical conclusion was not in conflict with his 2017 testimony regarding agreement with Dr. Doenges. The Commissioner further argues that the ALJ's reasoning for according little weight to Dr. Madsen's opinion was supported by substantial evidence.

### b.  Review of Relevant Evidence

In an August 2014 psychological evaluation, Dr. Doenges found that Plaintiff "is likely to be able to follow simple instructions, but may require repetition of instructions, extra time to complete tasks, frequent support and guidance in completing tasks, and/or repeated practice with supervision in order to master a new task." AR 787, 1400. The ALJ gave Dr. Doenges opinion "moderate weight" because the opinion was rendered in 2014 and "[t]he substantial weight of the evidence, including the treatment records from Southeast mental Health Clinic supports no more than moderate difficulties resulting from the claimant's depression and anxiety." AR 1400.

At the 2017 hearing, Dr. Pelc testified that Plaintiff was capable of "slightly more than simple and repetitive tasks without rapid or frequent changes, and would do best with only occasional social interaction," including supervisors. AR 191, 1399. When Dr. Pelc was asked if he agreed with Dr. Doenges' evaluation that Plaintiff "may need repetition of instructions, extra time to complete tasks, frequent support and guidance in completing tasks or repeated practice to master a new task," he responded, "[Dr.

Doenges] says she's likely to be able to follow simple instructions but may require some extra help in even doing that. So yes . . . I would agree with that." AR 194–95. In her decision, the ALJ gave "great weight" to Dr. Pelc's opinion, but did not discuss the fact that Dr. Pelc agreed with Dr. Doenges' assessment regarding extra supervision. AR 1399.

In a February 2019 opinion, Dr. Frommelt found that Plaintiff "can respond appropriately to supervision." AR 1398. The ALJ accorded "great weight for the period under review" to Dr. Frommelt's opinion. AR 1398. Dr. Frommelt's mental assessment form states that Plaintiff's "ability to sustain an ordinary routine without special supervision" and "ability to accept instructions and respond appropriately to criticism from supervisors" are "[n]ot significantly limited," and Plaintiff can "respond appropriately to supervision." AR 1524.

In a February 2019 psychological evaluation, Dr. Madsen opined that Plaintiff "would require additional supervision" in order to perform work activities. AR 1402, 2302. The ALJ accorded "little weight" to Dr. Madsen's opinion for five reasons: (1) Plaintiff "appears to interact well with providers despite telling Dr. Madsen she does not like to interact with others," (2) "[s]he was able to tolerate appearing in person at her hearing in Colorado Springs and elected to appear in person instead of by telephone or video hearing," (3) Dr. Madsen examined Plaintiff only one time, (4) his opinion was rendered outside of the relevant period, and (5) his opinion "is not consistent with the claimant's generally unremarkable mental status findings." AR 1402.

In the 2017 hearing, VE Pruding testified that if a person with Plaintiff's limitations required "extra time to complete tasks, frequent support and guidance in completing

tasks, and required repetition of any instructions," she would be precluded from competitive work. AR 224. Similarly, in the 2022 hearing, VE Thompson testified that if someone with Plaintiff's limitations required extra supervision, extra time, and repetition of instructions to complete tasks, and repeated practice and supervision to master new tasks, the person would be precluded from competitive work. AR 1435. In particular, VE Thompson testified that "the extra supervision and the time" is "the straw that breaks the camel's back" because "if an employee is requiring extra supervision and time throughout the course of the employment, those things are not typically tolerated by employers." AR 1435.

### c. Court's Ruling

Plaintiff first argues that no medical opinion supports the ALJ's decision not to include a limitation of extra supervision in Plaintiff's RFC. However, Dr. Frommelt clearly opined that Plaintiff can respond appropriately to supervision. In reply, Plaintiff argues that the Commissioner cannot rely on Dr. Frommelt's opinion for substantial evidence to support the absence of an additional supervision limitation because (a) Dr. Frommelt "simply signed a standard mental assessment form and was never asked this specific question," and (b) "the ALJ did not cite Dr. Frommelt's opinion as a reason to reject this limitation." ECF No. 14 at 10. Plaintiff's argument regarding the format of Dr. Frommelt's opinion is not well-taken. "The Tenth Circuit has expressly declined to adopt a categorical rule that check-box forms completed by treating physicians can be rejected as unsupported by substantial evidence." *Salazar v. Colvin*, No. 12-CV-01534-WYD, 2013 WL 5418048, at *4 (D. Colo. Sept. 27, 2013) (citing *Anderson v. Astrue*, 319 Fed. App'x 712, 721 (10th Cir. 2009)). Dr. Frommelt's opinion directly addressed Plaintiff's

need for additional supervision, and the format of the opinion is not a reason to reject it. Further, while the ALJ's decision does not explicitly state that she is not including a limitation of extra supervision in the RFC because of Dr. Frommelt's opinion, she explained that Dr. Frommelt opined that Plaintiff "can respond appropriately to supervision," and explained why she gave Dr. Frommelt's opinion great weight and the opinions of Dr. Doenges and Dr. Madsen less weight. *See* SSR 96–8p, 1996 WL 374184, at *7  ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").

Plaintiff argues that the ALJ gave Dr. Pelc's opinion great weight, and that this presumably means that the ALJ must also give great weight to the portion of Dr. Pelc's testimony in which he agrees with Dr. Doenges' opinion that Plaintiff may require extra supervision at work. In his remand order, Judge Jackson considered whether Dr. Pelc's testimony agreeing with Dr. Doenges was in conflict with Dr. Pelc's medical conclusion that Plaintiff could perform "slightly more" than simple, repetitive tasks. Citing *Haga v. Astrue*, 482 F.3d 1205 (10th Cir. 2007), Judge Jackson wrote:

> I do not read *Haga* to suggest that accepting an expert's medical conclusion requires an ALJ to parse through the expert's testimony and explain any extraneous comment that may be perceived to be inconsistent with that conclusion. Rather, the Tenth Circuit in *Haga* held that an ALJ may not accept *some* concrete medical conclusions from an expert while rejecting others without explanation . . . . [T]here is no clear conflict between Dr. Pelc's medical conclusion and his response to the questions posed by plaintiff's counsel. From my vantage, it seems as though Dr. Pelc believed that [Plaintiff] "may require some extra help" in following simple instructions, but that she is still able to handle "slightly more" than simple, routine tasks.

AR 1492. Judge Jackson therefore concluded that these two aspects of Dr. Pelc's testimony were not in conflict. In accordance with Judge Jackson's prior decision, the

Court holds that the ALJ was not required to parse through Dr. Pelc's testimony and explain why any additional comments Dr. Pelc made were adopted or not adopted in the RFC.

Plaintiff next argues that the five reasons the ALJ provided for giving little weight to Dr. Madsen's opinion do not amount to substantial evidence. Although the Court agrees that some of the reasons the ALJ gave were impermissible, on the whole, the Court concludes that the ALJ's decision to give little weight to Dr. Madsen's opinion was supported by "more than a scintilla" of evidence. *Raymond*, 621 F.3d at 1271–72. The Court agrees that the ALJ erred in concluding that Plaintiff was less limited in her ability to interact with others because, in the ALJ's view, she "appears to interact well with providers," because this constitutes an impermissible substitution of the ALJ's lay opinion for that of a medical provider. *Jimenez v. Berryhill*, 300 F. Supp. 3d 1295, 1303– 04 (D. Colo. 2018) (holding that "a person's ability to interact appropriately at the occasional medical appointment does not indicate that he or she can maintain the level of appropriate socialization necessary for a full-time job" and "the ALJ provided no medical evidence to support his conclusion that the ability to occasionally interact well with medical providers in exams correlates to an ability to interact appropriately with coworkers and supervisors"). The Court also agrees that the fact that Plaintiff attended one hearing in person is not a valid reason to accord little weight to Dr. Madsen's opinion—the Court declines to effectively punish a litigant for participating in the administrative process. However, the remaining three reasons that the ALJ provided for according little weight to Dr. Madsen's opinion constitute substantial evidence. The ALJ may consider the treatment relationship between the medical provider and a claimant,

and here, she appropriately pointed out that Dr. Madsen examined Plaintiff only one time. *See* 20 C.F.R. § 404.1527(c)(2). The ALJ also may consider that the opinion was rendered after the relevant time period, and that the opinion was inconsistent with what the ALJ characterized as Plaintiff's "generally unremarkable mental status findings."[3] Accordingly, the Court finds that the ALJ's decision to accord little weight to Dr. Madsen's opinion was supported by substantial evidence.

## IV.    Dr. Shapiro's Opinion

Because Plaintiff's original claim predates March 27, 2017, the ALJ's evaluation of opinion evidence from a treating physician must comport with the "treating physician rule" articulated in 20 C.F.R. § 404.1527. This regulation requires a sequential, two-step analysis. *See Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). First, the ALJ must determine whether the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," and if so, must afford the opinion "controlling weight." *See id.*; 20 C.F.R. § 404.1527(c)(2). If the ALJ determines that the opinion is not entitled to controlling weight, the ALJ should next apply the following six factors to determine how much weight to give the treating physician's opinion:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by

---

[3] Plaintiff also argues that her mental status examinations were not "generally unremarkable," and points out that many of these examinations show that Plaintiff was often anxious, depressed, irritable, hopeless, tearful, angry. However, the Commissioner also points out a number of examinations in which Plaintiff had more normal mental status examinations. This constitutes substantial evidence supporting the ALJ's determination, and the Court cannot reweigh this evidence. *Lax*, 489 F.3d at 1084.

> relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Krauser*, 638 F.3d at 1331. The ALJ need not "apply expressly" each of the six factors, *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007), but "the record must reflect that the ALJ *considered* every factor in the weight calculation." *K.L.M. v. Kijakazi*, No. 21-cv-00978-JLK, 2023 WL 2018903, at *7 (D. Colo. Feb. 15, 2023) (citing *Andersen v. Astrue*, 319 F. App'x 712, 718 (10th Cir. 2009)); *see also Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) ("Even if a treating physician's opinion is not entitled to controlling weight, [t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 . . . ." (internal quotations and citation omitted)). If the ALJ's decision fails to "give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned," a remand is required. *Watkins*, 350 F.3d at 1300.

In this case, Dr. Craig Shapiro was Plaintiff's treating physician. He opined that Plaintiff should not be exposed to any environmental pulmonary irritants. AR 814. However, the ALJ determined that Dr. Shapiro's records indicate that Plaintiff "has intermittent exacerbations of symptoms which warrant environmental and postural limitations, but not to the extreme degree noted in this opinion," and Dr. Shapiro's "treatment records do not contain reports of examinations, clinical observations or findings that would warrant such an extreme limit on exposure to everything in the environment." AR 1400. Accordingly, the ALJ gave Dr. Shapiro's opinion moderate weight, and the RFC states that Plaintiff "could tolerate occasional exposure to concentrated pulmonary irritants such as fumes, odors, dust, and gases." AR 1394–95.

Plaintiff argues that Dr. Shapiro's opinion should be entitled to controlling weight because he was Plaintiff's treating physician and his opinion is consistent with other evidence of record. However, the ALJ's decision recounts that Plaintiff's October 2013 chest imaging showed mild hyperinflation, March 2014 chest imaging "was negative showing no acute process," Plaintiff's "COPD symptoms have been described as minimal," and at times Plaintiff could speak in full sentences and had easy, unlabored respiratory efforts. AR 1398. The Court therefore finds that the ALJ permissibly concluded that Dr. Shapiro's opinion was inconsistent with other record evidence, and accordingly, the ALJ was not obligated to give the opinion controlling weight.

## Conclusion

For the reasons set forth above, the Commissioner's decision is **AFFIRMED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED**.

Dated this 26th day of September, 2024.     BY THE COURT:

N. Reid Neureiter
United States Magistrate Judge